UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
JTS/Simms, LLC,
    Debtor.　　　　　　　　　　　　　　No. 11-07-12153 SA

### SUPPLEMENT TO ORAL FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ORDER DENYING MOTION FOR STAY RELIEF FILED BY SILAR SPECIAL OPPORTUNITIES FUND, LP

In support of its order (doc 115) denying the motion for stay relief (doc 14) filed by Silar Special Opportunities Fund, LP ("Silar"), the Court issued findings of fact and conclusions of law orally on the record as permitted by Rule 7052, F.R.B.P. Minutes, Attachment 1 (notes of oral ruling[1]) – doc 108.  The Court ruled that even if Silar was entitled to charge the rates of interest and the back-end loan fee (or "back-end fee") specified in the loan documents, the collateral had sufficient value (over $8.5 million) to provide an equity cushion for Silar's interest in the property to justify not modifying the stay.

These additional (written) findings of fact and conclusions of law which the Court now issues (also prepared pursuant to Rule 7052) address issues raised by the parties which the Court did

---

[1] As is customary for this Court, the notes were prepared by the Court to deliver its decision, and are close to a verbatim transcript of the Court's prepared remarks.  Of course, the actual record for appeal or any other purpose is the electronic file created by the Court's digital audio recording system and stored on various servers.  For the reader's convenience, a copy of the notes are attached to this opinion.

not need to address initially in the course of deciding the motion for stay relief, even though the parties had submitted those issues to the Court for its decision as part of the stay litigation.[2]  The Court is now deciding these additional issues because they bear on new matters that have arisen in the case, particularly Debtor's motion to auction off the bulk of the estate's assets (doc 112) and Debtor's objection to Silar's proof of claim (doc 122).

**Additional Factual Background**

Silar's loan documents include the bridge loan agreement (Silar exhibit 1), a real estate promissory note (Silar exhibit 2), a mortgage (Silar exhibit 3), and a collateral assignment of rents and leases (Silar exhibit 4).  The terms of the loan were the subject of considerable negotiation and the deal was finally inked when, in Silar's perception, Troy Baillio on behalf of Debtor gave Silar a deadline to sign documents and do the deal or risk being sued.  The parties had been negotiating a 12-month term loan, but because of the shortage of time arising from Debtor's deadline to purchase the property, the parties executed an interim or bridge loan.  Silar exhibit 1 (Recitals and

---

[2] Even though stay litigation is often summary in form and therefore the adjudication of the issues therein is also often somewhat preliminary, the parties in this instance were clearly looking to the Court for decisions concerning the interest rate and back-end loan fee that they could use in subsequent proceedings without having to try the issues again.

paragraphs 2 and 3).  The loan documents were executed May 23, 2007; the loan was due July 23, 2007; and Debtor filed its petition August 31, 2007.  As is apparent, this is not a consumer case[3], and whatever one might say about the terms, there is no evidence of predatory lending practices.  These were sophisticated parties on both sides of the negotiations, and this loan entailed significant risk of late or otherwise troubled repayment.

The note sets an interest rate of 18% and a default interest rate of 24%.[4]  The note also provides as follows:

> This Note is payable as follows:  Maker shall pay accrued interest only on or before the twenty-third (23rd) day of June, 2007.  The entire indebtedness evidenced by this Note plus all accrued and unpaid interest and a back-end loan fee (the "Fee") in the amount of FOUR HUNDRED FIVE THOUSAND AND NO/100 Dollars ($405,000.00) shall be due and payable on July 23, 2007 (a "Maturity Date").  All payments shall be made at Lender's address at Attn: Robert Leeds, 333 Seventh Avenue, 3rd Floor, New York, NY 10001.
> Maker may prepay this Note, in whole or in part, at any time without penalty other than payment of the Fee upon a payment in full.  No partial payment and no prepayment, other than payment in full, shall entitle

---

[3] "This Note is given to evidence a business loan for the business purpose of Maker."  Silar Exhibit 2 at 1.

[4] The provision for the default rate of interest contains a typographical error: "... and thereafter at the rate of twenty percent (24%) per annum...."  The parties discussed a default rate of 24%, the term sheets provided a default rate of 10% above the non-default rate (which suggests that the larger 6% rather than 2% over the non-default rate was what the parties were contemplating), and six percent above the non-default rate rather than two percent is far more common.  In consequence the Court has decided that the parties intended 24% to be the default rate.

>     Maker to the release of any portion of the Property
>     from the Mortgage.
>     Upon any failure to make any payment on this Note as
>     agreed or any failure to perform Maker's obligations
>     under the Mortgage or any other document evidencing,
>     securing or otherwise executed in connection with the
>     loan evidenced by this Note, Lender, at its sole
>     discretion, may declare the entire outstanding
>     principal of this Note plus all interest thereon, the
>     Fee and any other amounts due to be immediately due and
>     payable on the date of such failure (a "Maturity
>     Date").

The interest rates and the back-end loan fee are the subject of the parties' disputes.

**Analysis**

INTEREST RATES[5]

"[F]ederal bankruptcy law, not state law, governs the distribution of a bankrupt's assets to his creditors."  American Surety Co. of New York v. Sampsell, 327 U.S. 269, 272 (1946). (Citations omitted.)  With respect to preconfirmation interest, the Supreme Court, in United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 242 (1989), held that while an award of "fees, costs, or charges" is dictated by the loan agreement, the award of interest is not.[6]  Thus, applying the Ron Pair

---

[5] A helpful discussion of the issue, including a summary of the cases as of 1998, is in Crabbe, Should an Over-Secured Creditor be Entitled to Post-Petition Interest at the Default Rate?, March 1998 ABI Journal 8.

[6] More precisely, the United States had a prepetition oversecured tax claim, and the debtor in possession argued that §506(b) did not permit the United States to be paid interest on the claim because it was a non-consensual lien; i.e., it did not arise from an agreement between the two parties.  Interpreting

Enterprises ruling to the opposite set of facts[7], one could conclude that the Court is not tethered to the Note in ruling what the preconfirmation interest rates should be.

Debtor has cited several cases to the Court in which interest rates have been reduced. And some of those cases have an impressive pedigree; e.g., Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 163 (1946), holding that equitable principles governing bankruptcy distribution determined that senior lienholders were not entitled to be paid interest on interest which would substantially reduce the payment to junior creditors:

> It is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor.

Id. at 165. See generally Sampsell, 327 U.S. at 272-73 (controlling equitable principles permitted payment to surety to be subordinated to payment of claims of laborers and materialmen); and Pepper v. Litton, 308 U.S. 295, 305 (1939)

---

that part of §506(b) which provides in part that for oversecured claims "there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose", the court held that there did not need to be an agreement that provided for interest in order for interest to be allowed on the claim. Id. at 241-42.

[7] In Ron Pair Enterprises, the government held nonconsensual oversecured prepetition claims. In this case Silar's lien is consensual.

("[A] bankruptcy court has full power to inquire into the validity of any claim asserted against the estate and to disallow it if it is ascertained to be without lawful existence."). (Citation omitted.)

Nevertheless, at least the starting point for consideration of the issue should be the rates the parties agreed on at the time of the transaction. Further, the mere fact that a debtor filed a bankruptcy petition should not open a tabula rasa on the issue. There is nothing about bankruptcy per se which automatically requires a complete reconsideration (or, as between the parties, a complete renegotiation) of the preconfirmation interest rate.

> Bankruptcy courts have construed Ron Pair to require analyzing default rates based on the facts and equities specific to each case. In re Consolidated Properties Ltd. Partnership, 152 B.R. 452, 457 (Bankr.D.Md.1993); In re DWS Invs., 121 B.R. 845, 849 (Bankr. C.D.Cal. 1990). This does not render the contracted-for default rate irrelevant. "[D]espite its equity pedigree, [bankruptcy] is a procedure for enforcing pre-bankruptcy entitlements under specified terms and conditions rather than a flight of redistributive fancy." In re Lapiana, 909 F.2d 221, 223 (7th Cir.1990). Creditors have a right to bargained-for post-petition interest and "bankruptcy judges are not empowered to dissolve rights in the name of equity." Id. at 224. What emerges from the post- Ron Pair decisions is a presumption in favor of the contract rate subject to rebuttal based upon equitable considerations. In re Courtland Estates Corp., 144 B.R. 5, 9 (Bankr.D.Mass.1992); In re Hollstrom, 133 B.R. 535, 539 (Bankr.D.Colo.1991); DWS Invs., 121 B.R. at 849 (Bankr.C.D.Cal.1990).

In re Terry Ltd. Partnership, 27 F.3d 241, 243 (7th Cir. 1994), cert. denied Invex Holdings, N.V. v. Equitable Life Ins. Co. of Iowa, 513 U.S. 948 (1994) (upholding trial court's decision not to reduce interest rate of second mortgagee in order to create equity for third mortgagee). But compare, e.g., In re Laymon, 958 F.2d 72, 75 (5th Cir. 1992), cert. denied Crozier v. Bradford, 506 U.S. 917 (1992) (remanded for examination of the equities in allowing a 10% non-default rate vs. 18% default rate).

As noted above, this project was not the safest to loan on. Everyone knew that going into the deal. Indeed, that was why Debtor was borrowing from a hedge fund instead of a local bank. And of course the hedge fund took that into consideration in calculating the pricing of its loan. In the circumstances, including taking into account the back-end fee (and without of course gainsaying the well established authority of a bankruptcy court to alter repayment terms on equitable grounds), 18% is not an unreasonable or inequitable predefault interest rate. The mere fact that a relatively high rate of interest may deprive other creditors of any distribution, or may even result in a failed reorganization, are not sufficient reasons by themselves to now bend the terms more in favor of the estate.

> Finally, the [trial] court emphasized the importance of enforcing, as close as possible, the parties bargained-for contract rights. When Invex Holdings entered its agreement with Terry, it did so fully aware

>     of Roosevelt's and Equitable's superior interests in
>     the property and the extent of those interests. In
>     short, Invex Holdings bargained for the risky position
>     in which it later found itself, and as the court
>     stated, "There is nothing equitable, however, in
>     diminishing one creditor's bargained for rights in
>     order to augment the rights bargained for by a second
>     creditor."

In re Terry Ltd. Partnership, 27 F.3d at 243.

The same can be said of the 24% default rate of interest.

> Pre and post-default interest rates are simply matters
> of pricing. The money costs more if not repaid when
> agreed. Had Congress wished to distinguish between the
> treatment of pre and post-default interest by section
> 506(b), it could easily enough have said so.

In re K & J Properties, Inc., 338 B.R. 450, 458 (Bankr. D. Colo. 2005) (allowing 36% default interest rate). An additional six percent above the predefault rate is not surprising or shocking; in fact, it is quite common.

Thus, despite the intellectual prowess and careful reasoning of the other courts which have come to different conclusions than this Court, the Court disagrees with the results of those other cases cited by Debtor. E.g., In re Hollstrom, 133 B.R. 535, 539-541 (Bankr. D. Colo. 1991) (rejecting 36% interest rate as completely unrelated to market rates or any risk of loss and having the effect of depriving remaining creditors of any distribution); In re DWS Investments, Inc., 121 B.R. 845, 846 (Bankr. C.D. Cal. 1990) (creditors not entitled to contractual default interest rate of 25% absent showing that 25% rate had any relationship to actual or projected losses as a result of

debtor's nonpayment – collateral valued at over 2 - 2.5 times the debt); In re White, 88 B.R. 498, 511 (Bankr. D. Mass. 1988) (contract default interest rate of 48% not usurious under state law and creditor never faced realistic risk of nonpayment of its debt; nevertheless default rate shocked conscience of court and rate held unenforceable as a penalty); and In re W.S. Sheppley & Co., 62 B.R. 271, 278-79 (Bankr. N.D. Iowa 1986) (default rate of 12% disapproved in view of facts that, inter alia, 9.27% non-default rate was a market rate, that creditor faced no prospect of nonpayment and that creditor was at least partly responsible for delaying the rapid disposition of the collateral[8]).

Without at all denying the authority of a bankruptcy court to modify interest rates, the Court finds that the facts of this case – a loan agreement vigorously negotiated between two sophisticated parties (with Silar closing the loan on short notice because of a perceived threat of suit[9]) and some risk of less than full payment to Silar – coupled with a hesitation to

---

[8] Whether the creditor has effectively increased the expense of the loan (and thereby likely increased its return) by actions it takes in the bankruptcy case, is of course subject to review by the Court. Thus allowance of the 24% default interest rate plus the back-end loan fee does not preclude Debtor from contesting the ultimate amount allowed for the claim, including attorney fees and interest expense that would not have been incurred but for unjustified action, if any, by the creditor.

[9] The Court has considered but rejected for lack of evidence the possibility that Silar closed the loan to avoid being sued but did so with the intention of not following through with the term loan.

change for general equitable reasons the terms that the parties negotiated, justify leaving the contractual default interest rate in place. The Court does not have carte blanche in the name of "equity" to refashion agreements. The exercise of such a power would be unfair to one of the parties. It would also potentially undermine the entire dispute-resolution system that the courts represent. See In re K & J Properties, Inc., 338 B.R. at 460.

Of course, the allowance of the contractual default interest rate necessarily relates to the issue of the back-end loan fee. The Court now turns to that issue.

BACK-END LOAN FEE

Silar's representative Hin-King Tai testified that the back-end fee was part of what Silar needed to earn on this loan to make it worth doing, and it was a "back-end" fee rather than a "front-end" fee simply because Debtor did not have the cash to pay it up front. Mr. Baillio testified that the back-end fee was to compensate Silar if Debtor obtained term financing from some source other than Silar, who wanted to do the replacement or term financing (or at least wanted to have the first crack at it). Silar exhibit 1 at 2, and term sheet. In consequence, Debtor argues, when Silar failed to provide the term financing for no good reason, it lost its entitlement to the back-end fee.

The Court finds Mr. Tai's account more credible.[10] The testimony and the documents all tell a tale of a rather desperate borrower trying to piece together the funding to purchase and renovate a property that had the potential to increase in value substantially if enough money was available. The tale includes a hedge fund looking for what might be considered an outsized return, and the capacity to supply the needed funds[11] (through borrowing from Wells Fargo coupled with the requisite [no longer exotic] financing vehicle) to achieve that size of return. An added "cash hit" of $405,000, even when added to the 18% interest, fits perfectly into this tale.

The Court also interprets the documents as supporting Silar's version of the events. Nothing in the promissory note suggests it was anything but an additional cost to Debtor of borrowing the money, just like the interest provision that appears in the same sentence. Silar exhibit 2. Similarly, the term sheet attached to the bridge loan agreement provides for an "upfront fee" of 2% and an "exit fee" of 4% of the "gross loan amount", specified as $6,700,000 in the term sheet. A total of 6% of $6,700,000 is $402,000; 6% of $6,750,000 (the amount actually loaned) is $405,000.

---

[10] In fact, the Court found Mr. Tai to be an entirely credible witness.

[11] Silar borrowed the funds from Wells Fargo using a special purpose entity, a (no longer so exotic) financing vehicle.

The back-end fee is the equivalent of interest. In effect, therefore, had Debtor repaid the principal plus two months of interest at 18% ($202,500) plus $405,000 for a total of $607,500, Debtor would have been paying interest on the two-month loan at an annualized rate of 54%. However, given that the $405,000 is a fixed number, and even with a 24% interest rate, the annualized rate decreases steadily as time passes. For example, if Silar were to be paid in full on May 23, 2008[12] (principal plus 18% for two months and 24% for ten months plus $405,000), the total interest would make for an effective annualized interest rate of 29%. Had Silar been paid in full on August 23, 2007 (18% for two months and 24% at one month, plus $405,000), the effective annualized rate would have been 44%.

Fifty-four percent is a breathtaking figure (albeit, at this point in the case, an inapplicable one). Nevertheless, the discussion concerning interest rates above is equally applicable to the back-end fee. The $405,000 was part of the deal that these parties, competent to represent their own interests, struck. No one has suggested that the deal, and particularly the cost of borrowing the money, violates any public policy. The agreement should be enforced by the Court absent some overriding

---

[12] The Court has used the May 23 date in this example simply as an example and not as a prediction. The discussion of interest rates does not address costs of course, which in theory ought to be a wash for Silar.

equitable considerations.

In this case, Debtor has not shown any such equitable considerations. In fact, to some extent, the equitable considerations militate against Debtor. In particular, the Court is concerned about the representations made to Silar about the additional financing that Debtor or related entities obtained. While these representations may not have been technically contrary to its agreement with Silar (see the Existing Encumbrances provision on page 4 of the term sheet attached to the Bridge Loan Agreement – Silar exhibit 1), it does appear that Silar was deceived.

The first example of that apparent deception concerns what seems clearly to be a "carry back" or retention of some of the debt by the seller Simms Building, Inc. Silar exhibits 20, 21 and 22. Mr. Baillio admitted that at closing he was about $650,000 short, but that he solved that problem by getting concessions from the realtors and "the building". (The solution was at best temporary; he also testified that the shortfall has not been satisfied.) Silar exhibit 22 is a copy of a collection action filed against Mr. Biallio and his spouse, attached to which are promissory notes of $50,000, $50,000 and $530,000, respectively dated March 21, May 10 and May 25, 2007. Silar exhibit 21 is in part a copy of a check dated May 21, 2007 (two days before the May 23 closing) in the amount of $530,000 written

on the account of JTS Properties and Investments, LLC ("JTSP&I"), the 97% owner of Debtor.  And Silar exhibit 20 is a copy of a May 25 letter in which Simms Building, Inc. told the title company (and therefore Silar) it was "not 'carrying back' any monies from the sale of the Simms Building."  Perhaps Simms Building, Inc. thought it had been paid by means of the $530,000 check, but Mr. Baillio testified that the check was never cashed or even processed and in any event the execution of the $530,000 note dated May 25 would belie that.  Indeed, Mr. Baillio testified that he had no knowledge at that time of that letter being written, nor of the check.[13]  Perhaps that is true.  On the other hand, one would have expected Silar to have asked exactly the same question of Mr. Baillio, and had he responded truthfully to Silar, Silar would not have had to rely on the response of Simms Building, Inc. to the title company inquiry.

Another instance of deception was the letter dated July 13, 2007 to Silar whereby Timothy Steider stated that "Phoenix Equity Ventures, LLC does not have a lien of record or any other instrument or record [sic], and does not claim a lien interest

---

[13] Mr. Baillio conceded the signature on the check was his, but explained that he would sign several checks in blank for use by his staff as needed, and that someone with access to the checks must have sent this check but without his knowledge.  The explanation would be perfectly reasonable if the check were, for example, made payable to a utility for several thousand dollars.  The explanation becomes less reasonable when the amount of the check exceeds a half million dollars and is made payable to the former owner.

Case 07-12153-s7    Doc 137    Filed 01/04/08    Entered 01/04/08 15:46:17 Page 14 of 18

against JTS Simms, LLC on the Simms Building." That assurance was false. Attached to the collection complaint that Phoenix Equity Ventures ("Phoenix") has filed against Debtor and others, is the documentation for a loan by Phoenix to JTSP&I for $250,000, secured by an escrowed warranty deed for a half interest in the property. JTSP&I executed the documentation through JTS/Simms, LLC, by Mr. Baillio. It is hard to believe that Mr. Baillio was not at least aware, if not outright complicit, in the deception practiced by Phoenix.[14] The fact that the July 13 letter was faxed to Joel Davis (Silar exhibit 17, at 1), who was an attorney representing JTS/Simms, LLC ten days later (Exhibits E and F to Complaint, Silar Exhibit 18), makes it even less likely that Mr. Baillio was not aiding in the deception of Silar.

Debtor's nonperformance of some of the prerequisites for the term loan also militates against disallowing the back-end loan fee. Two of those requirements (in addition to the requirement that there be no other liens on the property, discussed above)

---

[14] It may be that Mr. Steider intended to say that Phoenix did not have any other "instrument of record" rather than any other "instrument or record". Silar exhibit 17. If so, that would make the letter technically accurate (assuming "of record" means "of public record", which is typically what that means in these circumstances). However, the letter would still be a careful skirting of what Silar was really inquiring about.

Page 15 of 18

were the tenant estoppels[15] and the lockbox arrangement.  Given the somewhat disheveled status of the tenant leases when Debtor purchased the property, the requirement for the tenant estoppels was particularly appropriate.  By delivering at best a little over half of the estoppel certificates, not setting up the lockbox, and then failing to communicate with Silar as it sought answers for its questions and a way to implement the term loan, Mr. Baillio provided ample reason for Silar not to fund the term loan for Debtor.[16]

**Conclusion**

Given the background of how this financial arrangement came to be, and Debtor's performance since then, the Court finds no

---

[15] Mr. Baillio correctly testified that tenant estoppels are not explicitly listed in the term sheet as a requirement for the term loan.  Silar exhibit 1, exhibit B (the term sheet). Nevertheless, the last words on the term sheet are that the foregoing list of requirements is not exclusive.  In addition, the bridge loan agreement was entered into because the shortness of time did not allow Silar to complete its due diligence.  Silar exhibit 1 (Recitals and paragraphs 2 and 3).  That due diligence in a transaction of this sort would include tenant estoppels. Paragraph 3 permits Silar to demand and requires Debtor to provide "such additional agreements, documents, reports, materials, insurance, indemnities, opinions, amendments, confirmations and other materials and things of any nature as Lender may require to more fully and accurately implement the intent of this Agreement and to protect and ensure Lender's rights under and security for the Bridge Loan."  The conduct of the parties makes clear that Silar demanded the tenant estoppels and that Debtor thought it should provide them.

[16] Given the foregoing analysis, the Court need not look for any further failures by Debtor to fulfil the requirements for the term loan.

Case 07-12153-s7    Doc 137    Filed 01/04/08    Entered 01/04/08 15:46:17 Page 16 of 18

good reason, equitable or otherwise, to relieve Debtor of the contractual terms which it negotiated and entered into bankruptcy with. This is so even if modifying those arrangements would result in a higher return for other creditors or even Debtor. Thus Silar may charge the 24% contract default interest rate and may collect the back-end loan fee of $405,000, subject to offsets, if any, which any final claim resolution may show Debtor entitled to.

Since the foregoing are merely further findings of fact and conclusions of law in support of the order already entered which denied stay relief to Silar (doc 115), no further order will enter at this time.

_____
James S. Starzynski
United States Bankruptcy Judge

date entered on docket: January 4, 2008

COPY TO:

Jennie Deden Behles
Behles Law Firm, PC
PO Box 7070
Albuquerque, NM 87194-7070

Gail Gottlieb
Sutin, Thayer & Browne
PO Box 1945
Albuquerque, NM 87103-1945

George D Giddens, Jr
10400 Academy Rd NE Ste 350
Albuquerque, NM 87111-1229

Robert H Jacobvitz
500 Marquette NW Ste 650
Albuquerque, NM 87102-5309

Chris W Pierce
Velarde & Pierce
2531 Wyoming Blvd. NE
Albuquerque, NM 87112

Deron B Knoner
PO Box 25687
Albuquerque, NM 87125

Michael Wile
Vogel Campbell & Blueher PC
6100 Uptown Blvd. NE
Suite 500
Albuquerque, NM 87110

James A Askew
PO Box 1888
Albuquerque, NM 87103-1888

Alice Nystel Page
PO Box 608
Albuquerque, NM 87103-0608

Grubb & Ellis New Mexico
ATTN: Elizabeth Liming
2400 Louisiana Blvd, NE
Bldg1, Ste 220
Albuquerque, NM 87110